**KUZYK LAW, LLP**
Michael D. Braun (SBN 167416)
*mdb@kuzykclassactions.com*
1999 Avenue of the Stars, Ste. 1100
Los Angeles, CA 90067
Telephone: (213) 401-4100
Facsimile: (213) 401-0311

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LUIS NEGRETE and SIDE 2 SIDE on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BEST NUTRITIONALS LLC<br><br>Defendant. | CASE NO.: '21CV1258 JLS AGS<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Luis Negrete and Side 2 Side ("Plaintiffs"), on behalf of themselves and all others similarly situated, bring this class action against Best Nutritional's LLC ("BN" or "Defendant"), and on the basis of personal knowledge, information and belief, and the investigation of counsel, allege as follows:

## **INTRODUCTION**

1.      This is a straight-forward case of adulteration, deception, and fraud. Defendant markets and sells a line of products which claim to be "Pure Antarctic Krill," the quality of which is further assured by the use of good manufacturing practices ("GMP"), and third-party testing.







| Supplement Facts | | |
|---|---|---|
| **Serving Size: 1 Softgel** | | **Serving Per Container: 60** |
| **Amount Per Serving** | | **% Daily Value** |
| Vitamin A (From Krill) | 94 IU | 2% |
| Vitamin E ( From Krill) | 0.9 IU | <1% |
| Krill Oil | 1000 mg | ** |
| Typical Fatty Acid Capsule | | |
| Eicosapentaenoic acid (EPA) | 162 mg | ** |
| Docosahexaenoic acid (DHA) | 104 mg | ** |
| Omega-6 | 28 mg | ** |
| Omega-9 | 92 mg | ** |
| Other Omega-3 Fatty Acids | 70 mg | ** |
| Phospholipids | 400 mg | ** |
| Astaxanthin | 1 mg | ** |
| **\*\*Daily Value not established.** | | |

2.      In truth, however, lab analysis unequivocally demonstrates that the contents of this Product are <u>not</u> Krill, rendering its label claims false and the Product worthless.

3.      This is a proposed class action on behalf of a California, New York and nationwide class of consumers seeking redress for Defendant's deceptive and illegal practices associated with the advertising, labeling and sale of its Best Naturals Pure Antarctic Krill dietary supplement ("Product" or "Supplement").[1]

4.      As alleged herein, Defendant's conduct is in breach of warranty, violates California's Business and Professions Code § 17200, *et. seq.,* California's Business & Professions Code § l7500, *et. seq.,* California Civil Code § 1750, *et seq*., N.Y. Gen. Bus. Law § 349 et seq.,  N.Y. Gen. Bus. Law § 350 et seq., and is otherwise grounds for restitution on the basis of quasi-contract/unjust enrichment.

5.      Throughout the applicable class periods, Defendant falsely represented the fundamental nature of its Product, and as a result of this false and misleading labeling, was able to sell these Products to tens of thousands of unsuspecting consumers throughout California, New York and the United States.

---

[1] Class Products include Best Natural's Krill-500, Krill-1000, and Krill 1250.

## JURISDICTION AND VENUE

6. Jurisdiction of this Court is proper under 28 U.S.C. § 1332(d)(2). Diversity jurisdiction exists as Plaintiff Negrete is a resident of San Diego, California, Plaintiff Side to Side is a resident of New York, New York, and Defendant Best Nutritionals LLC is incorporated and headquartered in Roselle, New Jersey. The amount in controversy exceeds $5,000,000 for the Plaintiffs and members of the Class collectively, exclusive of interest and costs, by virtue of the combined purchase prices paid by Plaintiffs and members of the putative Class, and the profits reaped by Defendant from its transactions with Plaintiffs and the Class, as a direct and proximate result of the wrongful conduct alleged herein, and by virtue of the injunctive and equitable relief sought.

7. Venue is proper within this judicial district pursuant to 28 U.S.C. § 1391 because a substantial portion of the underlying transactions and events complained of occurred and affected persons and entities located in this judicial district.

## PARTIES

8. Plaintiff Luis Negrete is a resident of San Diego, California.

9. Mr. Negrete is a purchaser of Defendant's Best Naturals Pure Antarctic Krill.

10. Mr. Negrete believed the representations on the Product's label that, among other things, it was actual Krill oil.

11. Mr. Negrete believed that Defendant lawfully marketed and sold the Product.

12. Mr. Negrete relied on Defendant's labeling and was misled thereby.

13. Mr. Negrete would not have purchased the Product, or would have purchased the Product on different terms, had he known the truth.

14. Mr. Negrete was injured in fact and lost money as a result of Defendant's improper conduct.

15.    If Mr. Negrete has occasion to believe that Defendant's marketing and labeling is truthful, non-misleading, and lawful, he would consider purchasing the Product in the future.

16.    Plaintiff Side to Side is a resident of New York, New York.

17.    Ms. Side is a purchaser of Defendant's Best Naturals Pure Antarctic Krill.

18.    Ms. Side believed the representations on the Product's label that, among other things, it was actual Krill oil.

19.    She believed that Defendant lawfully marketed and sold the Product.

20.    Ms. Side relied on Defendant's labeling and was misled thereby.

21.    Ms. Side would not have purchased the Product, or would have purchased the Product on different terms, had she known the truth.

22.    Ms. Side was injured in fact and lost money as a result of Defendant's improper conduct.

23.    If Ms. Side has occasion to believe that Defendant's marketing and labeling is truthful, non-misleading, and lawful, she would consider purchasing the Product in the future.

24.    Defendant Best Nutritionals LLC is incorporated and headquartered in New Jersey.[2]

## **GENERAL ALLEGATIONS**

### A.    **BENEFITS OF OMEGA-3 FATTY ACIDS**

25.    Omega-3 Fatty Acids ("Omega-3" or "OM3") are polyunsaturated carboxylic acids that provide numerous health benefits to the human body including a

---

[2] See, https://www.nutramfg.com/ (last visited April 12, 2021)

variety of critical organs and systems (e.g., heart, brain, eyes, blood vessels, lungs, immune, endocrine, and reproductive systems).[3]

26.    Among the 11 types of OM3s, the three most important to human physiology are alpha-linolenic acid ("ALA"), docosahexaenoic acid ("DHA") and eicosapentaenoic acid ("EPA").[4]

27.    ALA Omega-3 fatty acids are primarily found in plant oils and generally used by the human body for energy. To be used for something other than energy, ALA must first be converted into EPA or DHA. Unfortunately, this conversion process is inefficient and results in only a small percentage of ALA being converted into EPA and DHA.

28.    In contrast, the primary source of EPA and DHA are marine oils from fatty fish and other seafoods.

29.    Although experts have not established a daily recommended amount for DHA and EPA, the National Institutes of Health, Office of Dietary Supplements ("NIH") acknowledges that many scientific studies show that eating fatty fish and other seafoods rich in DHA and EPA has beneficial effects with respect to a variety of adverse health conditions such as cardiovascular disease, age-related macular degeneration, Alzheimer's disease, dementia, dwindling cognitive function,

---

[3] *Omega-3 Fatty Acids*, National Institutes of Health, Office of Dietary Supplements, available at https://ods.od.nih.gov/factsheets/Omega3FattyAcids-Consumer; H. Breivik, *Long-chain Omega-3 Specialty Oils*, Woodhead Publishing in Food Science, Technology and Nutrition at 11 (hereinafter "Breivik at ___")(Clinical research has suggested that Omega-3s help prevent cardiovascular disease, Alzheimer's, dementia, macular degeneration, and rheumatoid arthritis. There is also support that Omega-3s provide benefits for sufferers of arthritis, Crohn's disease and patients with neuropsychiatric disorders such as depression and schizophrenia).

[4] Other Omega-3s include: hexadecatrienoic acid (HTA); stearidonic acid (SDA); eicosatrienoic acid (ETE); eicosatetraenoic acid (ETA); heneicosapentaenoic acid (HPA); docosapentaenoic acid (DPA); tetracosapentaenoic acid; and tetracosahexaenoic acid.

rheumatoid arthritis, high blood pressure, and variety of other conditions including, potentially, certain cancers.[5]

30.     Between 2017 and 2019, the American Heart Association ("AHA") released three science advisories related to Omega-3s, all of which recommend adults consume one to two servings of seafood per week to reduce the risk of congestive heart failure, coronary artery disease, stroke, and sudden cardiac death.  For people with existing coronary artery disease, the AHA recommends approximately 1g/day of EPA plus DHA.[6]

31.     In 2019 the U.S. Food and Drug Administration ("FDA") considered the weight of scientific evidence on the impact of OM3 and approved five qualified health claims relating to the consumption of the EPA/DHA and its effect on heart health.[7]

32.     Unfortunately, Americans generally do not consume a sufficient amount of EPA and DHA as part of their diet, and therefore require supplementation.[8] As a

---

[5] Available at https://ods.od.nih.gov/factsheets/Omega3FattyAcids-Consumer/

[6] Etherton, P., et al, *Omega-3 Fatty Acids and Cardiovascular Disease New Recommendations From the American Heart Association*, AHA Arteriosclerosis, Thrombosis, and Vascular Biology Journal (2003) available at https://www.ahajournals.org/doi/full/10.1161/01.ATV.0000057393.97337.AE;  *See also*, National Institutes of Health, *Omega-3 Fatty Acids*, available at https://ods.od.nih.gov/factsheets/Omega3FattyAcids-HealthProfessional/#:~:text=For%20people%20with%20existing%20coronary,of%20a%20physician%20%5B80%5D.

[7] *FDA Announces New Qualified Health Claims for EPA and DHA Omega-3 Consumption and the Risk of Hypertension and Coronary Heart Disease*, June 19, 2019, available at https://www.fda.gov/food/cfsan-constituent-updates/fda-announces-new-qualified-health-claims-epa-and-dha-omega-3-consumption-and-risk-hypertension-and.

[8] Mackay, *A Comparison of Synthetic Ethyl Ester Form Fish Oil vs. Natural Triglyceride Form*, available from http://www.promedics.ca/site/downloads/Triglycerides%20vs%20Ethyl%20Esters.pdf

result of this deficit, the demand for dietary supplements that provide Omega 3 exploded, and today it is an industry valued in excess of 5 billion dollars.[9]

**B.    <u>KRILL OIL</u>**

33.    Omega-3 fatty acids can be found in a variety of marine sources including fatty fish, krill and algae.[10] While each of these sources provide coveted EPA and DHA, there are material differences among them that drive consumer demand, market share and price.

34.    Krill are tiny, shrimp-like crustaceans that are found in abundance in the Antarctic Ocean. They are mainly herbivorous, feeding on the phytoplankton of the southern Antarctic. Like fish oil, krill oil is a rich source of Omega-3s, containing approximately 30 percent to 40 percent EPA and DHA.[11]  There are, however, numerous differences between standard fish oil and krill oil, which makes the latter both more desirable and expensive.

35.    Omega-3s are available in a variety of forms, e.g., triglyceride ("TAG"), ethyl ester ("EE"), re-esterified triglyceride ("rTAG") and phospholipid forms, among others. For example, the Omega-3s in krill oil are principally bound to phospholipids, while the Omega-3 fatty acids in standard fish oils are bound to triglycerides. In synthetic form, fish oil that has been molecularly transformed through the trans-esterification process, has Omega-3s bound to ethanol to form fatty acid ethyl esters.

---

[9] https://www.grandviewresearch.com/industry-analysis/omega-3-supplement-market

[10] Hossain, M.A., *Fish as Source of Polyunsaturated Fatty Acids (PUFAs), Which One is Better-Farmed or Wild?*, Advance Journal of Food Science and Technology 3(6): 455, 459, 2011.

[11] Bustos R, et al. *Oxidative stability of carotenoid pigments and polyunsaturated fatty acids in microparticulate diets containing krill oil for nutrition of marine fish larvae*. J Food Engin 2003;56:289-93.

36.    Each of these forms is different and has unique pharmacokinetic properties. In a competitive marketplace, Krill oil has emerged as a successful market segment due to its unique high concentrations of EPA/DHA in phospholipid form, its antioxidant qualities and clean-water origins. Krill oil also typically provides more EPA per gram than standard fish oil capsules (240 mg per gram versus 180 mg per gram).[12]

37.    Several clinical studies suggest that the molecular form of the omega-3 fatty acids (i.e., triglycerides, ethyl-esters, phospholipids) is of importance for their biological effect as well as distribution of the omega-3 fatty acids in the body.[13] For example, one study concluded that krill's high concentrations of phospholipids offer greater bioavailability of n-3 polyunsaturated fatty acids than those of triacylglycerols or fatty acid ethyl esters.[14]

38.    In fact, this very claim – that krill oil is "better absorbed than fish oil" – is emblazoned on the principal display panel of every Class Product.

---

[12] Logan AC., *Omega-3 fatty acids and major depression: A primer for the mental health professional*. Lipids in Health and Disease 2004;3:25.

[13] Bjørn Winther, Nils Hoem, Kjetil Berge, Léon Reubsaet , *Elucidation of Phosphatidylcholine Composition in Krill Oil Extracted from Euphausia superba*, , Lipids. 2011 Jan; 46(1): 25–36. Published online 2010 Sep 17. doi: 10.1007/s11745-010-3472-6; https://www.drugs.com/medical-answers/krill-oil-vs-fish-oil-difference-3040407/;

[14] Köhler A, Sarkkinen E, Tapola N, Niskanen T, Bruheim I. B*ioavailability of fatty acids from krill oil, krill meal and fish oil in healthy subjects--a randomized, single-dose, cross-over trial.* Lipids Health Dis. 2015 Mar 15;14:19. doi: 10.1186/s12944-015-0015-4. PMID: 25884846; PMCID: PMC4374210; National Institutes of Health, Office of Dietary Supplements, (Krill oil contains omega-3s primarily as phospholipids, and limited research suggests that these have somewhat higher bioavailability than the omega-3s in fish oil) available at https://ods.od.nih.gov/factsheets/Omega3FattyAcids-HealthProfessional/

39.    In addition to being a good source of Omega-3s, krill is rich in carotenoid astaxanthin which has been shown to have 10 times more antioxidant activity than beta-carotene and as much as 1,000 times more than vitamin E.[15] It also is a source of alpha-tocopherol (vitamin E) and an unusual derivative, known as marine-derived tocopherol, that may function as a more efficient antioxidant than alpha-tocopherol. [16]

40.    Finally, because krill are at the lower end of the food chain, and come from the less polluted waters of the Antarctic, many believe they are a purer and cleaner source of omega-3s than fish oil.

41.    Given these qualities, and others. Krill oil has become a highly sought-after commodity for which consumers are willing to pay a premium. [17]  Indeed, as a result of its popularity, Krill oil has emerged as a defined Omega-3 market segment[18] valued at $352.9 million in 2018 and expected to reach $843.3 million by the year 2026.[19]

---

[15] Jyonouchi H, et al. *Immunomodulating actions of carotenoids: Enhancement of in vivo and in vitro antibody production to T-dependent antigens*. Nutr Cancer 1994; 21:47-58.

[16] Dunlap WC, et al. *Notothenoid fish, krill and phytoplankton from Antarctica contain a vitamin E constituent (alpha-tocomonoenol) functionally associated with cold-water adaptation*. Comp Biochem Physiol B 2002;133:299-305; Yamamoto Y, et al. *An unusual vitamin E constituent provides antioxidant protection in marine organisms adapted to cold water environments*. Proc Natl Acad Sci USA 2001;98:13144-48.

[17] *What is the difference between fish oil and krill oil? Is one better than then other,* Consumer Lab, November 13, 2020, available at https://www.consumerlab.com/answers/is-krill-oil-better-than-fish-oil/fish-oil-vs-krill-oil/.

[18] https://www.grandviewresearch.com/industry-analysis/omega-3-supplement-market

[19] RD Reports & Data, https://www.globenewswire.com/news-release/2020/01/28/1976366/0/en/Krill-Oil-Market-To-Reach-USD-843-3-Million-By-2026-Reports-And-Data.html.

42.    Unfortunately, Krill's popularity has also made it a target for unscrupulous manufacturers seeking to turn a profit at the expense of unwary consumers.

**C.    BEST NATURAL GUARANTEE**

43.    Best Naturals proudly describes itself as passionate about making "a difference in the health and wellbeing of [] consumers by providing top quality vitamins and dietary supplements….Today Best Naturals remains as a highly-trusted brand with products that ensure nutritional support to its best."[20]   BN claims its "products are manufactured in a cGMP[21] compliant environment" and assures consumers that providing authentic quality products is central to its business philosophy, and indeed is reflected in five of six the Company's core values:

> a. _Raw Material Sourcing & Vendor Qualification_: At Best Naturals, we have been constantly looking to connect with only the highest quality suppliers for our ingredients in U.S. and abroad. Best Naturals strict vendor qualification program includes screening by a GMP audit questionnaire, followed by facility audits to ensure we select reliable suppliers. As a result, Best Naturals has close working relationships with a group of trusted vendors who consistently furnish the highest quality materials.
>
> b. _Raw Material Testing_: All ingredients are carefully inspected upon receipt, sampled, and held under quarantine until analytical testing is completed to confirm that they meet all specifications for purity,

---

[20] https://shopbestnaturals.com/pages/about-us (last visited 3-1-21)

[21] _Facts About the Current Good Manufacturing Practices (CGMPs)_ available at https://www.fda.gov/drugs/pharmaceutical-quality-resources/facts-about-current-good-manufacturing-practices-cgmps

activity, and physical characteristics. All materials undergo thorough testing prior to release for manufacturing. Any material that does not meet all specifications is rejected.

    c. <u>In-Process Testing</u>: During the manufacturing process, testing is also conducted to assure that each product conforms to the specifications established for it.

    d. <u>Finished Product Testing</u>: All manufactured products undergo final analytical testing to ensure their safety, purity, and activity levels. Final testing includes physical and chemical analyses and microbiological testing to guarantee each Best Naturals product meets all quality specifications.

    e. <u>Quality Audits</u>: Best Naturals undergoes regular quality audits by its licensing and certifying agencies. We also conduct internal audits of our procedures and processes to ensure compliance within our organization

## D.    BEST NATURALS KRILL IS ADULTERATED

44.    Due to its relative scarcity, its unique properties and numerous health benefits, krill oil typically sells at premium over standard fish oil products making it an attractive commodity for unscrupulous suppliers to adulterate.

45.    The most common substitutes are soybean oil or fish oil, which are used to mimic the EPA and DHA provided by krill. Thereafter, astaxanthin, which naturally occurs in krill, is separately added to the mixture providing the capsules with Krill's hallmark red color.[22]

---

[22] Akanbi, Taiwo & Barrow, Colin. (2018), *Compositional Information Useful for Authentication of Krill Oil and the Detection of Adulterants*, Food Analytical Methods. 11. 10.1007/s12161-017-0988-x, available at

46.     Unfortunately, without the benefit of analytical testing, a consumer would have no reasonable way of knowing that a particular krill oil was fake. Fortunately, however, with analytical testing, the determination is unequivocal.

47.     Unlike fish oil, krill oil contains significant amounts of choline-containing phospholipids and an appreciable concentration of phosphatidylcholine. While adulteration using common fish oil may mimic Omega-3 content, it remains in triglyceride form. The addition of an adulterant such as soybean oil will add phospholipid content, but it will not be attached to the Omega-3. Only natural krill oil has its Omega-3 DHA and EPA attached to a phospholipid.

48.     The United States Pharmacopeia ("USP"), one of the most comprehensive sources for medicine and dietary supplement standards in the world, maintains a National Formulary ("USP-NF") which provides over 300 reference standards for dietary supplements. The standards are used to help ensure the quality of these products and their ingredients, and to protect the safety of consumers.[23]

49.     Among its quality standards, the USP-NF provides a series of monographs which articulate the quality expectations for "identity, strength, purity, and performance" of certain dietary supplements. *Id.* Among others, it has published a monograph for authentic krill oil.[24]

50.     The graph below compares the mass spectra of the USP standard for krill oil and the C16 DHA standard with Best Naturals' Krill Oil. As unequivocally

---

https://www.researchgate.net/publication/318409775_Compositional_Information_Useful_for_Authentication_of_Krill_Oil_and_the_Detection_of_Adulterants.

[23] https://www.usp.org/about/public-policy/overview-of-monographs

[24] United States Pharmacopeia – National Formulary Catalog # 1270424, available at https://store.usp.org/searchresults?Ntt=krill%20oil*&Rdm=677&searchType=simple&type=search.

demonstrated below, the Best Naturals Product does not contain phosphatidylcholine, is therefore not authentic krill, and is clearly adulterated.[25]



E.  **SPECIFIC LABELING VIOLATIONS**

51.    The Federal Food, Drug & Cosmetic Act ("FDCA") broadly regulates the sale of food and beverages to the consuming public.  21 U.S.C §301.  It was promulgated in significant part to prevent consumer deception and was principally

---

[25] The C16 DHA-PC standard + Na identifies not only the existence of phospholipids, but specifically phosphatidylcholine that is unique to krill which typically peaks at a mass of 828.55. Plaintiffs separately had the Product analyzed using Nuclear Magnetic Resonance ("NMR"), the result of which confirmed the absence of phospholipids and conclusively determined the Product is not authentic krill oil. Both analytical tests were compliant with 21 C.F.R. §101.9(g)(2).

implemented through the creation of a uniform system of labeling on which consumers could rely to make informed purchasing decisions. The FDCA generally prohibits labeling that is false or misleading. 21 U.S.C. § 343.

52.    The Nutrition Labeling and Education Act of 1990 amended the FDCA by requiring that most foods, including dietary supplements, bear nutrition labeling. Subsequently, the Dietary Supplement Health and Education Act of 1994 ("DSHEA") amended the FDCA to define dietary supplements and implemented specific labeling requirements pertaining to them. As such, dietary supplements must be labeled in accordance with the mandates of the FDCA. BN's Product labels not only violate the clear mandates of the FDCA, but are independently false, misleading, unlawful, and deceptive in violation of state consumer protection laws.[26]

53.    21 U.S.C. §342 states that a food shall be deemed to be adulterated: (b)(1) if any valuable constituent has been in whole or in part omitted or abstracted therefrom; or (2) if any substance has been substituted wholly or in part therefor. Moreover, 21 U.S.C. §342 (g)(1) states that products are adulterated if they have been "prepared, packed, or held under conditions that do not meet current good manufacturing practice regulations (CGMP)…" Among others, Subpart E of the CGMP rule requires a manufacturer to implement quality control operations in the manufacturing, packaging, labeling, and holding operations for producing the dietary supplement to ensure quality and that the dietary supplement is packaged and labeled as specified in the master manufacturing record. 21 C.F.R. §111.65.

54.    The fact that the Product is adulterated, further renders its express label claims misbranded and subsequently false, misleading, deceptive. "A food shall be deemed to be misbranded (a) (1) if its labeling is false or misleading in any

---

[26] California's Sherman Food, Drug and Cosmetic Law ("Sherman Law"), which adopts the FDCA in its entirety, identically provides that, "[a]ny food is misbranded if its labeling is false or misleading in any particular." California Health & Safety Code, Article 6, §110660.

particular." 21 USC §343. Not only is the statement of identity and common or usual name of this Product not Krill Oil, its Supplement Facts, claiming the primary ingredient is krill is also false.

55.    In addition to the false and misleading claims made on the Product's principal display panel and in its Supplement Facts section, the label is also false and misleading in the following respects:



a. The Product is not krill oil nor produced from 100% pure Antarctic krill;

b. Despite its CGMP seal, an adulterated product cannot be compliant with Current Good Manufacturing Practices;

c. An adulterated product, whose true contents are unknown, cannot support structure function claims regarding triglyceride levels, cardiovascular health, joint health or absorption levels;

d. Notwithstanding the fact the contents of the Product are adulterated, Krill caught in the Antarctic is not and cannot be a product of the U.S.A., rendering the Made in USA claim false and misleading.

56. Best Naturals Product labels not only violate the clear mandates of the FDCA, but are independently false and misleading under state consumer protection statutes.

## ECONOMIC INJURY

57. Plaintiffs sought to buy products that were lawfully labeled, marketed and sold.

58. Plaintiffs saw and relied on Defendant's misleading labeling of their Products.

59. Plaintiffs believed that the Products purchased contained real krill oil.

60. Plaintiffs believed that the Products were lawfully marketed and sold.

61. In reliance on the claims made by Defendant regarding the identity and qualities of its Products, Plaintiffs paid for Products which they did not receive.

62. As a result of their reliance on Defendant's misrepresentations, Plaintiffs received Products that lacked the primary ingredient which they reasonably believed it contained.

63. Plaintiff received Products that were unlawfully marketed and sold.

64. Plaintiffs lost money and thereby suffered injury as they would not have purchased this Product absent the misrepresentation.

65. Defendant knew, or should have known, that the statement of identity and contents of a dietary supplement are material to a consumer's purchasing decision.

66.     Plaintiffs each altered their position to their detriment and suffered damages in an amount equal to the amounts they paid for the Product, and/or in additional amounts attributable to the deception.

67.     By engaging in the false and deceptive conduct alleged herein Defendant reaped, and continues to reap financial benefits in the form of sales and profits from its Products.

68.     Plaintiffs would be willing to purchase BN Products again in the future should they be able to rely on Defendant's labeling and marketing as truthful and non-deceptive.

## CLASS ACTION ALLEGATIONS

69.     Plaintiffs bring this action on behalf of themselves and on behalf of classes of all others similarly situated consumers defined as follows:

> a.  **National**: All persons in the United States who purchased Class Products in the United States during the Class Period.
>
> b.  **New York:** All persons in New York who purchased the Class Products in New York during the Class Period.
>
> c.  **California:** All persons in California who purchased the Class Products in California during the Class Period.
>
> d.  **Class Period** is the maximum time allowable as determined by the statute of limitation periods accompanying each cause of action.

70.     Plaintiffs bring this class action pursuant to Federal Rule of Civil Procedure 23(a), and 23(b)(1), 23(b)(2), 23(b)(3) and 23(c)(4).

71.     Excluded from the Classes are: (i) Defendant and their employees, principals, affiliated entities, legal representatives, successors and assigns; and (ii) the judges to whom this action is assigned.

72.     Upon information and belief, there are tens of thousands of members of the Class. Therefore, individual joinder of all members of the Class would be impracticable.

73. There is a well-defined community of interest in the questions of law and fact affecting the parties represented in this action.

74. Common questions of law or fact exist as to all members of the Class. These questions predominate over the questions affecting only individual Class members. These common legal or factual questions include but are not limited to:

    a. Whether Defendant marketed, packaged, or sold the Class Products to Plaintiffs and those similarly situated using false, misleading, or deceptive statements or representations;

    b. Whether Defendant omitted or misrepresented material facts in connection with the sales of its Products;

    c. Whether Defendant participated in and pursued the common course of conduct complained of herein;

    d. Whether Defendant has been unjustly enriched as a result of its unlawful business practices;

    e. Whether Defendant's actions violate the Unfair Competition Law, Cal. Bus. & Prof. Code §§17200, *et seq*. (the "UCL");

    f. Whether Defendant's actions violate the False Advertising Law, Cal. Bus. & Prof. Code §§17500, *et seq*. (the "FAL");

    g. Whether Defendant's actions violate the Consumers Legal Remedies Act, Cal. Civ. Code §§1750, *et seq*. (the "CLRA");

    h. Whether Defendant's actions violate the N.Y. Gen. Bus. Laws § 349, *et. seq.*;

    i. Whether Defendant's actions violate N.Y. Gen. Bus. Laws § 350 *et. seq.*;

    j. Whether Defendant's actions constitute breach of express warranty;

    k. Whether Defendant should be enjoined from continuing the above-described practices;

l.   Whether Plaintiffs and members of the Class are entitled to declaratory relief; and

m.   Whether Defendant should be required to make restitution, disgorge profits, reimburse losses, and pay damages as a result of the above-described practices.

75.   Plaintiffs' claims are typical of the claims of the Class, in that Plaintiffs were consumers who purchased Defendant's Products. Plaintiffs are no different in any relevant respect from any other Class member who purchased the Product, and the relief sought is common to the Class.

76.   Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class they seek to represent, and they have retained counsel competent and experienced in conducting complex class action litigation. Plaintiffs and their counsel will adequately protect the interests of the Class.

77.   A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual Class member likely will be relatively small, especially given the cost of the Products at issue and the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's conduct. Thus, it would be virtually impossible for members of the Class individually to effectively redress the wrongs done to them. Moreover, even if members of the Class could afford individual actions, it would still not be preferable to class-wide litigation. Individualized actions present the potential for inconsistent or contradictory judgments. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

78.   In the alternative, the Class may be certified because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate preliminary and final equitable relief with respect to each Class.

79.    The requirements for maintaining a class action pursuant to Rule 23(b)(2) are also met, as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## FIRST CAUSE OF ACTION
**Unlawful Business Practices**
**Violation of The Unfair Competition Law ("UCL")**
**Bus. & Prof. Code §§17200,** *et seq.*
**[On Behalf of the California Subclass]**

80.    Plaintiffs incorporate each and every allegation contained in the paragraphs above as if restated herein.

81.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code §17200.

82.    A business act or practice is "unlawful" if it violates any established state or federal law.

83.    Defendant's acts, omissions, misrepresentations, practices, and/or non-disclosures concerning the Products alleged herein, constitute "unlawful" business acts and practices in that they violate the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§301, et seq. and its implementing regulations, including, at least, the following sections:

      a.  21 U.S.C. §343(a), which deems food misbranded when its labeling contains a statement that is false or misleading in any particular;

      b.  21 C.F.R. §102.5(a)-(d), which prohibits the naming of foods so as to create an erroneous impression about the presence or absence of ingredient(s) or component(s) therein;

      c.  21 U.S.C. §§331and 333, which prohibits the introduction of misbranded foods into interstate commerce.

d. 21 C.F.R. §101.3 and 21 C.F.R. §101.36 as described above, pertaining to, *inter alia,* use of common or usual names.

84.    California has expressly adopted federal labeling requirements as its own pursuant to the Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 109875 et seq. (the "Sherman Law"), the Sherman Law, which provides that "[a]ll food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food regulations of this state." §110100.

85.    Each of BN's violations of federal law and regulations violates California's Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code § 109875 et seq. (the "Sherman Law"), including, but not limited to, the following sections:

86.    Section 110100 (adopting all FDA regulations as state regulations);

87.    Section 110290 ("In determining whether the labeling or advertisement of a food . . . is misleading, all representations made or suggested by statement, word, design, device, sound, or any combination of these, shall be taken into account.");

88.    Section 110390 ("It is unlawful for any person to disseminate any false advertisement of any food. . . .  An advertisement is false if it is false or misleading in any particular.");

89.    Section 110395 ("It is unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food . . . that is falsely advertised");

90.    Section 110398 ("It is unlawful for any person to advertise any food, drug, device, or cosmetic that is adulterated or misbranded");

91.    Section 110400 ("It is unlawful for any person to receive in commerce any food . . . that is falsely advertised or to deliver or proffer for delivery any such food . . . ."); and

92.    Section 110660 ("Any food is misbranded if its labeling is false or misleading in any particular").

93.     This identical conduct serves as the sole factual basis of each cause of action brought by this Complaint, and Plaintiffs do not seek to enforce any of the state law claims to impose any standard of conduct that exceeds that which would violate FDCA § 403(a)(1).

94.     Each of the challenged omissions, statements, and actions by BN violates the FDCA, and the Sherman Law, and consequently violates the "unlawful" prong of the UCL.

95.     BN's conduct is further "unlawful" because it violates California's False Advertising Law, CAL. Bus. & Prof. Code §17500 et seq. (the "FAL"), and California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 et seq. (the "CLRA"), as discussed in the claims below.

96.     By committing the unlawful acts and practices alleged above, Defendant has engaged, and continues to be engaged, in unlawful business practices within the meaning of California Business and Professions Code §§17200, *et seq.*

97.     Through its unlawful acts and practices, Defendant has obtained, and continues to unfairly obtain, money from members of the Class. As such, Plaintiff requests that this Court cause Defendant to restore this money to Plaintiff and all members of the Class, to disgorge the profits Defendant made on these transactions, and to enjoin Defendant from continuing to violate the Unfair Competition Law or violating it in the same fashion in the future. Otherwise, the Class may be irreparably harmed and denied an effective and complete remedy if such an order is not granted.

## SECOND CAUSE OF ACTION

**Unfair Business Practices**
**Violation of The Unfair Competition Law**
**Bus. & Prof. Code §§ 17200, *et seq*.**
**[On Behalf of the California Subclass]**

98.  Plaintiffs incorporate each and every allegation contained in the paragraphs above as if restated herein.

99.  The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. Prof. Code §17200.

100.  A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

101.  Defendant has violated, and continues to violate, the "unfair" prong of the UCL through its false and misleading description of the Products. The gravity of the harm to members of the Class resulting from such unfair acts and practices outweighs any conceivable reasons, justifications, or motives of Defendant for engaging in such deceptive acts and practices. By committing the acts and practices alleged above, Defendant engaged, and continued to engage, in unfair business practices within the meaning of California Business and Professions Code §§17200, *et seq*.

102.  Through its unfair acts and practices, Defendant obtained, and continues to unfairly obtain, money from members of the Class. As such, Plaintiffs have been injured and request that this Court cause Defendant to restore this money to Plaintiff and the members of the Class, to disgorge the profits Defendant made on its Products, and to enjoin Defendant from continuing to violate the Unfair Competition Law or violating it in the same fashion in the future. Otherwise, the Class may be irreparably harmed and denied an effective and complete remedy if such an Order is not granted.

### THIRD CAUSE OF ACTION

**Fraudulent Business Practices
Violation of The Unfair Competition Law
Bus. & Prof. Code §§ 17200, *et seq*.
[On Behalf of the California Subclass]**

103.   Plaintiffs incorporate each and every allegation contained in the paragraphs above as if restated herein.

104.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code §17200.

105.   A business act or practice is "fraudulent" under the UCL if it actually deceives or is likely to deceive members of the consuming public.

106.   Defendant's acts and practices of mislabeling its Products in a manner to suggest they contain something they do not.

107.   As a result of the conduct described above, Defendant has been, and will continue to be, unjustly enriched at the expense of Plaintiffs and members of the proposed Class. Specifically, Defendant has been unjustly enriched by the profits it has obtained from Plaintiffs and the Class from the purchases of its Products.

108.   Through its fraudulent acts and practices, Defendant has improperly obtained, and continues to improperly obtain, money from members of the Class. As such, Plaintiffs request that this Court cause Defendant to restore this money to Plaintiffs and the Class, to disgorge the profits Defendant has made, and to enjoin Defendant from continuing to violate the Unfair Competition Law or violating it in the same fashion in the future. Otherwise, the Class may be irreparably harmed and denied an effective and complete remedy if such an Order is not granted.

# FOURTH CAUSE OF ACTION

**False Advertising**
**Violation of California Business & Professions Code §§ l7500, *et seq*.**
**[On Behalf of the California Subclass]**

109.   Plaintiffs incorporate each and every allegation contained in the paragraphs above as if restated herein.

110.   Defendant uses advertising and packaging to sell its Products. Defendant disseminates advertising regarding their Products which by their very nature are deceptive, untrue, or misleading within the meaning of California Business & Professions Code §§17500, *et seq.* because those advertising statements contained on the labels are misleading and likely to deceive, and continue to deceive, members of the putative Class and the general public.

111.   In making and disseminating the statements alleged herein, Defendant knew or should have known that the statements were untrue or misleading, and acted in violation of California Business & Professions Code §§17500, *et seq.*

112.   The misrepresentations and non-disclosures by Defendant of the material facts detailed above constitute false and misleading advertising and therefore constitute a violation of California Business & Professions Code §§17500, *et seq.*

113.   Through its deceptive acts and practices, Defendant has improperly and illegally obtained money from Plaintiff and the members of the Class. As such, Plaintiffs request that this Court cause Defendant to restore this money to Plaintiff and the members of the Class, and to enjoin Defendant from continuing to violate California Business & Professions Code §§17500, *et seq.*, as discussed above. Otherwise, Plaintiff and those similarly situated will continue to be harmed by Defendant's false and/or misleading advertising.

114.   Pursuant to California Business & Professions Code §17535, Plaintiffs seek an Order of this Court ordering Defendant to fully disclose the true nature of

their misrepresentations. Plaintiff additionally requests an Order: (1) requiring Defendant to disgorge its ill-gotten gains, (2) award full restitution of all monies wrongfully acquired by Defendant and (3), interest and attorneys' fees. Plaintiffs and the Class may be irreparably harmed and denied an effective and complete remedy if such an Order is not granted.

## FIFTH CAUSE OF ACTION

### Violation of the Consumers Legal Remedies Act
### California Civil Code §§ 1750, *et seq*.
### [On Behalf of the California Subclass]

115.   Plaintiffs incorporate each and every allegation contained in the paragraphs above as if restated herein.

116.   This cause of action is brought pursuant to the Consumers Legal Remedies Act, California Civil Code §§1750, *et seq*. (the "CLRA").

117.   Plaintiffs and each member of the proposed Class are "consumers" within the meaning of Civil Code §1761(d).

118.   The purchases of the Products by consumers constitute "transactions" within the meaning of Civil Code §1761(e) and the Products constitute "goods" within the meaning of Civil Code §1761(a).

119.   Defendant has violated, and continues to violate, the CLRA in at least the following respects:

   a.   §1770(5) pertaining to misrepresentations regarding the characteristics of goods sold—specifying that misleading representations regarding ingredients violate the CLRA;

   b.   §1770(7) pertaining to misrepresentations regarding the standard, quality, or grade of goods sold; and

   c.   § 1770(9) pertaining to goods advertised with the intent not to provide what is advertised.

120.   Defendant knew, or should have known, that the labeling of its Products violated consumer protection laws, and that these statements would be relied upon by Plaintiffs and the members of the Class.

121.   The representations were made to Plaintiffs and all members of the Class. Plaintiffs relied on the accuracy of the representations on Defendant's labels which formed a material basis for his decision to purchase the Products. Moreover, based on the very materiality of Defendant's misrepresentations uniformly made on or omitted from its Product labels, reliance may be presumed or inferred for all members of the Class.

122.   Defendant carried out the scheme set forth in this Complaint willfully, wantonly, and with reckless disregard for the interests of Plaintiffs and the Class, and as a result, Plaintiffs and the Class have suffered an ascertainable loss of money or property.

123.   Plaintiffs and the members of the Class request that this Court enjoin Defendant from continuing to engage in the unlawful and deceptive methods, acts and practices alleged above, pursuant to California Civil Code §1780(a)(2). Unless Defendant is permanently enjoined from continuing to engage in such violations of the CLRA, future consumers of Defendant's Products will be damaged by its acts and practices in the same way as have Plaintiffs and the members of the proposed Class.

124.   On or about March 31, 2021, Plaintiffs served a CLRA demand pursuant to Civil Code §1782, notifying Defendant of the conduct described herein and that such conduct was in violation of particular provisions of Civil Code §1770. More than thirty days has elapsed since transmitting this demand without any response from the Defendant entitling Plaintiffs to damages pursuant to Civil Code § 1780(a).

### SIXTH CAUSE OF ACTION
### Breach of Express Warranty

125.  Plaintiff incorporates each and every allegation contained in the paragraphs above as if rewritten herein.

126.  Plaintiff's express warranty claims are based on violations of N.Y. CLS UCC § 2-313, § 2-607 and Cal. Com. Code §2313. Defendant was afforded reasonable notice in writing of this claim in advance of the filing of this complaint.

127.  Defendant made express warranties to Plaintiffs and members of the Class that the Products they purchased consisted of krill oil.

128.  The express warranties made to Plaintiffs and members of the Class appear on every Product label. This warranty regarding the nature of the Product marketed by Defendant specifically relates to the goods being purchased and became the basis of the bargain.

129.  Plaintiffs and the Class purchased the Products in the belief that they conformed to the express warranties that were made on the Products' labels.

130.  Defendant breached the express warranties made to Plaintiffs and members of the Class by failing to supply goods that conformed to the warranties it made. As a result, Plaintiffs and members of the Class suffered injury and deserve to be compensated for the damages they suffered.

131.  Plaintiffs and the members of the Class paid money for the Products. However, Plaintiffs and the members of the Class did not obtain the full value of the advertised Products. If Plaintiff and other members of the Class had known of the true nature of the Products, they would not have purchased them or paid less for them. Accordingly, Plaintiffs and members of the Class have suffered injury in fact and lost money or property as a result of Defendant's wrongful conduct.

132.  Plaintiffs and the Class are therefore entitled to recover damages, punitive damages, equitable relief such as restitution and disgorgement of profits, and declaratory and injunctive relief.

## SEVENTH CAUSE OF ACTION

### VIOLATION OF N.Y. GEN. BUS. LAW § 349, *Et Seq.*
**[On Behalf of the New York Subclass]**

133.   Plaintiffs incorporate each and every allegation contained in the paragraphs above as if rewritten herein.

134.   Plaintiffs bring this claim on behalf of the New York Class for violation of New York's Consumer Protection from Deceptive Acts and Practices Law, N.Y. GEN. BUS. LAW § 349 et seq.

135.   New York General Business Law Section 349 ("GBL § 349") declares unlawful "[deceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state ... "

136.   Defendant's labeling and marketing of the Product, as alleged herein, constitutes "deceptive" acts and practices within the meaning of GBL §349.

137.   Plaintiffs and Class Members have been injured inasmuch as they paid for and/or paid a premium for a Product that, contrary to its label, was not krill oil.

138.   GBL § 349(h) provides in relevant part that "any person who has been injured by reason of any violation of [GBL § 349] may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

139.   In accordance with §349(h), Plaintiffs seek an order enjoining Defendant from continuing the unlawful deceptive acts and practices set forth above.

140.   Absent a Court order enjoining the unlawful deceptive acts and practices, Defendant will continue their false and misleading marketing campaign and, in doing so, irreparably harm each member of the Class.

141.   As a consequence of Defendant's deceptive acts and practices, Plaintiff and other members of the Class suffered an ascertainable loss of monies. By reason of the foregoing, Plaintiffs and other members of the Class seek actual damages or statutory damages of $50 per violation, whichever is greater, as well as punitive damages. N.Y. GEN. BUS. LAW § 349(h).

### EIGHTH CAUSE OF ACTION
### N.Y. GEN. BUS. LAW § 350, *Et Seq.*
### [On Behalf of the New York Subclass]

142.   Plaintiffs incorporate each and every allegation contained in the paragraphs above as if rewritten herein.

143.   N.Y. Gen. Bus. Law § 350 declares false advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state to be unlawful. The term 'false advertising' means advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual. 91. N.Y. Gen. Bus. Law § 350-a(l).

144.   Defendant's labeling and advertisements contain untrue and materially misleading statements regarding the contents of the Supplement.

145.   Plaintiffs and members of the Class have been injured inasmuch as they relied upon the labeling and advertising and paid a premium for a product that did not

conform to its representations. Accordingly, Plaintiffs and the Class Members received less than what they bargained and/or for which they paid a premium.

146. Defendant's advertising and product labeling induced Plaintiffs and Class Members to buy their Product.

147. Defendant knew, or by exercising reasonable care should have known, that its statements and representations as described in this Complaint were untrue and/or misleading.

148. Defendant made the material misrepresentations described in this Complaint on its Product labels.

149. As a result of Defendant's false or misleading labeling and advertising, Plaintiff and Class Members are entitled to monetary damages, statutory damages, injunctive relief, restitution, disgorgement of all monies obtained by means of BN's unlawful conduct, interest, and attorneys' fees and costs.

## NINTH CAUSE OF ACTION
### Restitution Based On Quasi-Contract/Unjust Enrichment

150. Plaintiffs incorporate each and every allegation contained in the paragraphs above as if rewritten herein.

151. Defendant's conduct in enticing Plaintiff and the Class to purchase their Products with false and misleading packaging is unlawful because the statements contained on the Defendant's Product labels are untrue.

152. Defendant took monies from Plaintiffs and the Class for these Products and have been unjustly enriched at the expense of Plaintiffs and the Class as result of their unlawful conduct alleged herein, thereby creating a quasi-contractual obligation on Defendant to restore these ill-gotten gains to Plaintiff and the Class. It is against equity and good conscience to permit Defendant to retain the ill-gotten benefits received from Plaintiffs and Class members.

153.   As a direct and proximate result of Defendant's unjust enrichment, Plaintiffs and the Class are entitled to restitution or restitutionary disgorgement in an amount to be proved at trial.

## **PRAYER FOR RELIEF**

THEREFORE, Plaintiffs, on behalf of themselves and on behalf of the other members of the Class and for the Counts so applicable on behalf of the general public request an award and relief as follows:

A.     An order certifying that this action is properly brought and may be maintained as a class action, that Plaintiffs be appointed Class Representatives, and Plaintiffs' counsel be appointed Lead Counsel for the Class.

B.     Restitution in such amount that Plaintiffs and all members of the Class paid to purchase Defendant's Products or restitutionary disgorgement of the profits Defendant obtained from those transactions, for Causes of Action for which they are available.

C.     Compensatory damages for Causes of Action for which they are available.

D.     Statutory penalties for Causes of Action for which they are available.

E.     Punitive Damages for Causes of Action for which they are available.

F.     A declaration and Order enjoining Defendant from marketing and labeling their Products deceptively, in violation of laws and regulations as specified in this Complaint.

G.     An Order awarding Plaintiffs their costs of suit, including reasonable attorneys' fees and pre and post judgment interest.

H.     An Order requiring an accounting for, and imposition of, a constructive trust upon all monies received by Defendant as a result of the unfair, misleading, fraudulent and unlawful conduct alleged herein.

I.     Such other and further relief as may be deemed necessary or appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all causes of action or issues so triable.


DATED: July 13, 2021                    Respectfully submitted,


/s/ Michael D. Braun
**KUZYK LAW, LLP**
1999 Avenue of the Stars, Ste. 1100
Los Angeles, California 90067
Telephone:  (213) 401-4100
Facsimile:  (213) 401-0311
Email:  mdb@kuzykclassactions.com

*Counsel for Plaintiff*

COMPLAINT FOR DAMAGES, EQUITABLE, DECLARATORY, AND INJUNCTIVE RELIEF